## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| GREEK ORTHODOX ARCHDIOCESE FOUNDATION, by and through GEORGE KERITSIS, TRUSTEE, Individually and on Behalf of All Others Similarly Situated, | : : : : : | **Case No. 08-cv-3013-WHP** |
| Plaintiff, | : | ECF Case |
| **CLASS ACTION COMPLAINT** | : | |
| vs. | : : | **FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| THE BEAR STEARNS COMPANIES, INC., JAMES E. CAYNE, ALAN D. SCHWARTZ, and SAMUEL L. MOLINARO, JR., | : : : | **DEMAND FOR JURY TRIAL** |
| Defendants. | : : | |

### INTRODUCTION

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of The Bear Stearns Companies, Inc. ("Bear Stearns" or the "Company") between March 12, 2008 and March 14, 2008 (the "Class Period").  This action is brought against Bear Stearns and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act").

2.      Bear Stearns, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide.

3.      During the Class Period, Defendants issued materially false and misleading statements regarding the Company's financial condition. As a result of Defendants' false statements, Bear Stearns stock continued to trade at artificially inflated prices during the Class Period.

1

## JURISDICTION AND VENUE

4.      Jurisdiction is conferred by §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

(a)      Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District; and

(b) Bear Stearns' principal executive offices are located at 383 Madison Avenue, New York, New York.

## THE PARTIES

5.      Plaintiff, Greek Orthodox Archdiocese Foundation, by and through George Keritsis, Trustee, purchased Bear Stearns common stock as described in the attached certification and was damaged thereby.  Plaintiff purchased the Company's common stock on the same day the Company's CEO, Alan Schwartz, publicly reassured the investing public that the Company was not facing a liquidity crisis.   Schwartz's statement was a critical influence on the investing public to purchase the Company's common stock.

6.      Defendant Bear Stearns, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide. The Company operates through three segments: Capital Markets, Global Clearing Services, and Wealth Management. Bear Stearns is headquartered in New York, New York.

7.      Defendant James E. Cayne ("Cayne") is, and at all relevant times was Chairman of the Board of Directors and former Chief Executive Officer ("CEO") of Bear Stearns.

2

8. Defendant Alan D. Schwartz ("Schwartz") was, at all relevant times, President and CEO of Bear Stearns.

9. Defendant Samuel L. Molinaro, Jr. ("Molinaro") was, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of Bear Stearns. On August 5, 2007 he was also appointed COO.

10. Defendants Cayne, Schwartz and Molinaro (the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Bear Stearns' quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the information that is that is alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or could cause them to be corrected. Because of their positions with the Company, and their access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were materially false and misleading at the time made. The Individual Defendants are therefore liable for the false statements pleaded herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

11. Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Bear Stearns. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Bear Stearns common stock was a success, as it: (i) deceived the investing public

3

regarding Bear Stearns' prospects and business; (ii) artificially inflated the price of Bear Stearns' common stock; and (iii) caused Plaintiff and other members of the Class to purchase Bear Stearns common stock at inflated prices.

12.    The Individual Defendants knew, contrary to the public statements, that Bear Stearns had participated in and played a central role in packaging and financing high-risk, complex derivative investments which, by March 14, 2008, the Individual Defendants knew had not been properly supervised and knew that Bear Stearns' internal financial controls failed to maintain adequate reserves to protect its asset base.

13.    On March 14, 2008, the Individual Defendants knew that the complexity of the derivative investments and deteriorating market for those investments had made it nearly impossible for Bear Stearns to liquidate its positions in these products at anywhere near the purchase price.  The Individual Defendants also knew that the losses being suffered by Bear Stearns on the value of its investments was amplified by the huge amount of leverage, or borrowed money, that the Company used to invest in these exotic securities.

14.    Through these opaque and highly risky transactions in exotic derivative investments, the Individual Defendants risked the shareholders' value in order to artificially inflate Bear Stearns' financial results, which gave the Individual Defendants, personally, millions of dollars in bonuses, perks and compensation, but left the Company bankrupt and its shareholders devastated.

4

## BACKGROUND

15.   Bear Stearns is primarily a holding company that, through its broker-dealer and international bank subsidiaries, provides investment banking, securities and derivatives trading, clearance, and brokerage services worldwide. The Company operates through three segments: Capital Markets, Global Clearing Services, and Wealth Management. The Capital Markets segment comprises institutional equities, fixed income, and investment banking operations. The institutional equities operations consist of sales, trading, and research of equities, block trading, convertible bonds, over-the-counter equities, equity derivatives, and risk and convertible arbitrage. The fixed income operations include sales, trading, origination, and research of mortgage and asset-backed securities, corporate and government bonds, municipal bonds, high yield products, foreign exchange, interest rate, and credit derivatives. The investment banking operations comprise the provision of services in capital raising, strategic advice, mergers and acquisitions, and merchant banking. The Global Clearing Services segment offers execution, clearing, margin lending, and securities lending to hedge funds, broker-dealers, and registered investment advisors. The Wealth Management segment provides private client services, such as investment services, access to the Company's resources and professionals and asset management services for managing equity, fixed income, and alternative assets for corporate pension plans, public systems, endowments, foundations, multiemployer plans, insurance companies, corporations, families, and high-net-worth individuals.

## SUBSTANTIVE ALLEGATIONS

16.     The Class Period begins on March 12, 2008, the day Bear Stearns' CEO and Defendant Alan D. Schwartz dismissed recurring speculation that the investment bank is facing a cash crunch.  Specifically, Schwartz announced in a televised interview on CNBC that, *"[w]e don't see any pressure on our liquidity, let alone a liquidity crisis."* [emphasis added.]  Bear Stearns finished fiscal 2007 with $17 billion of cash sitting at the parent company level as a "liquidity cushion," he said.  Schwartz went on to further state during his interview, *"[t]hat cushion has been virtually unchanged.  We have $17 billion or so <u>excess</u> cash on the balance sheet."* [emphasis added.]

17.     As reported by CNNMony.com on March 12, 2006:

**Bear Stearns CEO: We'll meet estimates**

Investors cheer after Alan Schwartz says the bank has a $17 billion safety net and its liquidity remains intact.

NEW YORK (AP) -- *Shares of Bear Stearns Cos. leaped Wednesday after the investment bank's chief executive said he is "comfortable" that the company's profit will fall within the range of analysts' estimates for the first quarter.*

In an interview with CNBC, Alan Schwartz said he expects Bear Stearns to fall within the range of estimates that analysts on Wall Street forecast for the fiscal first quarter, which ended last month.

Analysts' expectations for profit range from 46 cents per share to $1.61 per share.

*Schwartz also denied rumors that the company's liquidity is under threat. Bear Stearns still has a $17 billion cushion against losses, he said.*

*"Our balance sheet has not weakened at all," he said. "We don't see any pressure on our liquidity."*

> *Bear Stearns' stock spiked $3.33, or 5.29%, to $66.30 in morning*
> *trading Wednesday.*

(emphasis added).

18.    Trading in Bear Stearns' common stock on March 12, 2008, the day of

Defendant Schwartz's comments, was approximately 3.5 times its average volume.

19.    On March 13, 2008, after the market closed, news that Bear Stearns was

forced to seek emergency financing from the Federal Reserve and JPMorgan Chase hit

the market.  As Market Watch reported on March 14, 2008:

> Bear Stearns Cos. Inc. went on life support Friday, forced to accept an
> extraordinary bailout package after being deserted by the clients and
> counterparties at the heart of the Wall Street firm's business.
>
> Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to
> $30, their biggest one-day drop in at least two decades.  Bear said the rescue
> consists of getting short-term financing from the Fed, through JPMorgan, after its
> liquidity "deteriorated significantly" during the past 24 hours.
>
> ***
>
> Bear's crisis is the latest sign that the U.S. financial system is cracking under the
> weight of a global credit crunch that was sparked by last year's subprime
> mortgage meltdown. The Fed has slashed interest rates and central banks
> have injected roughly $1 trillion into the banking system since then, but the
> crunch continues.

20.    On this news, Bear Stearns' stock plummeted $27 to close at $30 per

share - a one-day decline of 47%, on volume over 18 times the three-month average.

Yet, even this drop did not represent the true devastation to Bear Stearns'

shareholders.

### JPMorgan and the Federal Reserve Rescue Bear Stearns

21.    Despite Schwartz's public statements reassuring the investing public that

the Company was not facing a liquidity crisis, after the market closed on March 13,

7

2008, news that Bear Stearns was forced to seek emergency financing from the Federal Reserve and JPMorgan Chase hit the market.

22.    Specifically, on Friday, March 14, 2008, the Company announced that JPMorgan in conjunction with the Federal Reserve Bank of New York would provide temporary bail-out financing for the Company.  On news of the announcement, the Company's stock closed at $30 per share, representing a stock market value of roughly $3.5 billion.

23.    On March 14, 2008, Market Watch reported:

Bear Stearns Cos. Inc. went on life support Friday, forced to accept an extraordinary bailout package after being deserted by the clients and counterparties at the heart of the Wall Street firm's business.

Triggering a sell-off throughout the financial sector, Bear shares slumped 47% to $30, their biggest one-day drop in at least two decades. Bear said the rescue consists of getting short-term financing from the Fed, through JPMorgan, after its liquidity "deteriorated significantly" during the past 24 hours.

***

Bear's crisis is the latest sign that the U.S. financial system is cracking under the weight of a global credit crunch that was sparked by last year's subprime mortgage meltdown. The Fed has slashed interest rates and central banks have injected roughly $1 trillion into the banking system since then, but the crunch continues.

The Fed's decision to bail out a brokerage firm recalls other financial crises in which authorities tried to limit turmoil by propping up institutions including Penn Central, Continental Illinois, Orange County, California and hedge fund Long-Term Capital Management.

"What is different this time is that the dominoes are falling in so many different sectors, markets, industries and countries - all at the same time and there is yet no end in sight," said Sherry Cooper, chief economist at BMO Capital Markets.

24.   On March 14, 2008, CFO.com issued a report disclosing Bear Stearns' liquidity crisis.  Specifically, the article states in relevant part:

**Sudden Liquidity Crisis for Bear Stearns**

The investment bank turns to JPMorgan and the Fed for funds after a cash-out blitz by clients and lenders.

A sudden surge of "broad cash outflows" from counterparties and customers on Thursday forced Bear Stearns to tap JPMorgan Chase and the Federal Reserve for funds to shore up liquidity, the investment bank's chief executive said Friday.

During a hastily convened conference call, CEO Alan Schwartz said the bank continued to have very strong liquidity in the first part of the week, but demands from prime brokerage clients, repo clients, and lenders to cash out late Thursday forced the move. Said CFO Sam Molinaro: "Counterparties that were providing secured financing against assets were no longer willing to provide financing. We lost a lot of capacity." At the pace funds were being withdrawn, the firm recognized that there could be continued liquidity demands that would "outstrip our resources," said Schwartz.

Under the agreement, JPMorgan will borrow funds from the Fed's discount window and relend them to Bear Stearns for 28 days.  The borrowing will be secured by Bear Stearns collateral. If the collateral falls in value, the Fed, not JPMorgan, will bear the risk.

Bear Stearns used JPMorgan for the deal because the commercial bank is its clearing agent for its collateral, said Molinaro, so "it was easy for them to see the kind and quality of collateral we have available and we could therefore move very quickly."

The financing is a bridge to a more permanent solution, Molinaro emphasized. Bear Stearns has been consulting with investment bank Lazard LLC for months to explore strategic alternatives that "run the gamut," he said, adding that any deal would both protect customers and maximize shareholder value.

In the meantime, Bear Stearns hopes to assuage the "significant amount of rumor and innuendo" about its position in the financial markets by moving up its first-quarter earnings release to Monday, March 17, after market close. At that time, it will disclose more information about its positions, said Molinaro.

Analysts have forecast a profit of 46 cents per share to $1.61 per share, and according to Schwartz, the company still expects to post numbers within that band. "I am aware of the wide range of estimates that analysts

have out," he said. "We continue to be comfortable that we will be within that range."

Both Molinaro and Schwartz underscored that the liquidity situation at Bear Stearns deteriorated rapidly. It was just on Wednesday that Schwartz said on CNBC that the investment bank's "balance sheet, liquidity, and capital remain strong" and that it had a $17 billion cushion to work with.

## FURTHER DEVASTATING DISCLOSURES

25.    On Sunday, March 16, 2008, it was announced that JPMorgan Chase was

purchasing Bear Stearns for $2 per share.  As The Wall Street Journal reported on

March 17, 2008:

> JPMorgan Buys Bear in Fire Sale, As Fed Widens Credit to Avert Crisis Ailing Firm Sold For Just $2 a Share In U.S.-Backed Deal Pushed to the brink of collapse by the mortgage crisis, Bear Stearns Cos. agreed - after prodding by the federal government - to be sold to JPMorgan Chase & Co. for the fire-sale price of $2 a share in stock, or about $236 million.
>
> Bear Stearns had a stock-market value of about $3.5 billion as of Friday - and was worth $20 billion in January 2007. But the crisis of confidence that swept the firm and fueled a customer exodus in recent days left Bear Stearns with a horrible choice: sell the firm - at any price - to a big bank willing to assume its trading obligations or file for bankruptcy.
>
> "At the end of the day, what Bear Stearns was looking at was either taking $2 a share or going bust," said one person involved in the negotiations. "Those were the only options."
>
> To help facilitate the deal, the Federal Reserve is taking the extraordinary step of providing as much as $30 billion in financing for Bear Stearns's less-liquid assets, such as mortgage securities that the firm has been unable to sell, in what is believed to be the largest Fed advance on record to a single company. Fed officials wouldn't describe the exact financing terms or assets involved. But if those assets decline in value, the Fed would bear any loss, not JPMorgan.
>
> ***
>
> The deal already is prompting howls of protest from Bear Stearns shareholders, since the New York company last week indicated that its book value was still close to its reported level of about $84 share at the end of the fiscal year. "Why is

this better for shareholders of Bear Stearns than a Chapter 11 filing?" one Bear shareholder asked JPMorgan executives in a conference call last night.

\* \* \*

James Cayne, Bear Stearns's chairman, who had been participating in a bridge tournament when the crisis unfolded, returned to New York on Saturday and participated in the negotiations, said one person familiar with the discussions.

"We're very comfortable with what we found [in due diligence] and what we acquired, but we needed a pretty substantial cushion" from the Fed, Bill Winters, cohead of JPMorgan's investment bank, said in a conference call last night.

The deal is expected to close by the end of June, an unusually quick time frame. Federal regulators already have signed off on the deal, which will require a vote of Bear Stearns shareholders.

26.    On March 17, 2008, The New York Times described JPMorgan's deal to save Bear Stearns as "shocking." As reported in relevant part:

JPMorgan Pays $2 a Share for Bear Stearns

In a shocking deal reached on Sunday to save Bear Stearns, JPMorgan Chase agreed to pay a mere $2 a share to buy all of Bear — less than one-tenth the firm's market price on Friday.

As part of the watershed deal, JPMorgan and the Federal Reserve will guarantee the huge trading obligations of the troubled firm, which was driven to the brink of bankruptcy by what amounted to a run on the bank.

Reflecting Bear's dire straits, JPMorgan agreed to pay only about $270 million in stock for the firm, which had run up big losses on investments linked to mortgages.

JPMorgan is buying Bear, which has 14,000 employees, for a third the price at which the smaller firm went public in 1985. Only a year ago, Bear's shares sold for $170. The sale price includes Bear Stearns' soaring Madison Avenue headquarters.

The agreement ended a day in which bankers and policy makers were racing to complete the takeover agreement before financial markets in Asia opened on Monday, fearing that the financial panic could spread if the 85-year-old investment bank failed to find a buyer.

As the trading day began in Tokyo, however, markets tumbled more than 4 percent. In the United States, investors faced another week of gut-wrenching volatility in American markets.

Despite the sale of Bear, investors fear that others in the industry, like Lehman Brothers, already reeling from losses on mortgage-related investments, could face further blows.

The deal for Bear, done at the behest of the Fed and the Treasury Department, punctuates the stunning downfall of one of Wall Street's biggest and most storied firms. Bear had weathered the vagaries of the markets for 85 years, surviving the Depression and a dozen recessions only to meet its end in the rapidly unfolding credit crisis now afflicting the American economy.

A throwback to a bygone era, Bear Stearns still operated as a cigar-chomping, suspender-wearing culture where taking risks was rewarded. It was a firm that was never considered truly white-shoe, an outsider that defied its mainstream rivals.

When the Federal Reserve helped plan a bailout in 1998 of Long Term Capital Management, the hedge fund, Bear Stearns proudly refused to join the effort. Until recent weeks, Alan "Ace" Greenberg, Bear Stearns's chairman for more than 20 years and a championship bridge player, still regaled its partners over lengthy lunches about gambling with the firm's money in its wood-paneled dining room.

The cut-price deal for Bear Stearns reflects deep misgivings about its future and the enormous obligations that JPMorgan is assuming in guaranteeing the firm's obligations. In an unusual move, the Fed will provide financing for the transaction, including support for as much as $30 billion of Bear Stearns's "less-liquid assets."

Wall Street was stunned by the news on Sunday night. "This is like waking up in summer with snow on the ground," said Ron Geffner, a partner Sadis & Goldberg and a former enforcement lawyer for the Securities and Exchange Commission. "The price is indicative that there were bigger problems at Bear than clients and the public realized."

The deal followed a weekend of frantic negotiations to save the ailing firm. With the Fed and Treasury Department patched in by conference call from Washington, Bear Stearns executives held the equivalent of a speed-dating auction over the weekend, with prospective bidders holed up in a half dozen conference rooms at its Madison Avenue headquarters. More than 150 JPMorgan employees descended on Bear Stearns to examine the firm's books and trading accounts.

Even as those talks took place, Bear Stearns simultaneously prepared to file for bankruptcy protection in the event a deal could not be struck, underscoring the severity of its troubles.

On Sunday night, Jamie Dimon, the chief executive of JPMorgan, held a conference call with the heads of major American financial companies to alert them to the deal and allay their concerns about doing business with Bear Stearns.

"JPMorgan Chase stands behind Bear Stearns," Mr. Dimon said in a statement. "Bear Stearns's clients and counterparties should feel secure that JPMorgan is guaranteeing Bear Stearns's counterparty risk. We welcome their clients, counterparties and employees to our firm, and we are glad to be their partner." While Bear Stearns toyed with suitors like big private equity firms like the J.C. Flowers & Company, the only meaningful bidder was JPMorgan.

The deal is a major coup for Mr. Dimon, who slept only a handful of hours over the weekend while negotiating with Bear and government officials. Over the last few years, he has focused intensely on cutting costs, improving technology and integrating JPMorgan's disparate operations. But he also has been adamant about preparing the company for an economic downturn.

For JPMorgan, one of the few major banks to emerge relatively unscathed from the subprime crisis, the deal provides a major entry to prime brokerage, which provides financing to hedge funds. While that business has been lucrative in recent years, it has slowed as the financial markets have slumped.

Bear also would give JPMorgan a much bigger presence in the mortgage securities business, which the bank's executives say they are committed in spite of the recent market downturn.

There are, of course, some drawbacks to a deal, even at a bargain-basement price. Mr. Dimon has long expressed doubts that combining two big investment banks is a good idea. Bear's prime brokerage business would require a big technology investment. And there are often severe cultural issues and significant management overlap.

It is unclear how many of Bear Stearns's employees, who together own a third of the company, will remain after the combination. People involved in the talks suggested that as much as a third of the staff could lose their jobs. The deal also raises the prospect that some employees at JPMorgan, which was already considering cutbacks, may face the prospect of additional layoffs as the two firms merge their operations.

With Bear, JPMorgan also inherits a balance sheet that is packed with financial land mines, though the Fed has agreed to protect the firm from a certain amount of liability. Even though JPMorgan has performed well through this recent turbulence, it is unclear if it would want that additional risk.

"Having taken Bear Stearns out of the problem category, and the strong action by the Federal Reserve, we would anticipate the market will behave quite differently on Monday than it was Thursday or Friday," Michael Cavanaugh, JPMorgan's chief financial officer, told analysts during a conference call.

The swiftness of Mr. Dimon's decision to buy Bear is remarkable given that he has not been an aggressive acquirer since he joined the firm after selling it BankOne [sic], where he was chief executive. He has cautioned patience about making acquisitions, though he had suggested in recent months that the firm might be ready to make a major deal.

Earlier this month, the co-chief executive of JPMorgan's investment bank, William T. Winters, said on a conference call with investors: "If a special opportunity came up to acquire a prime broker at a decent return, we wouldn't hesitate. We've always said, 'Boy, if there was one for sale, we'd love to look at it.' "

A deal needed to be reached quickly to protect the business from collapsing entirely. With most if not all of its clients stopping trading with the firm, its days were numbered.

***

Many hedge funds had started expressing concern about Bear Stearns by late Thursday. Jana Partners, a large hedge fund, for example, sent a memo to its investors that said, "In response to many recent inquiries regarding Bear Stearns, we are writing to inform you that we have no direct exposure to Bear Stearns or its affiliates through a prime brokerage relationship or otherwise."

Not all investors are expected to be pleased with the deal. A conference call with investors and analysts on Sunday night was broken up when a Bear Stearns shareholder sought an explanation of why he would be better off approving this transaction rather than seeing Bear Stearns file for a Chapter 11 bankruptcy.

The JPMorgan executives demurred, instead referring the investor to Bear Stearns executives for an explanation. The shareholder declared that he would vote against the deal.

Afterward, Mr. Cavanaugh said JPMorgan felt comfortable in pulling the trigger despite the short due-diligence process. "We've known Bear Stearns for a long time," Mr. Cavanaugh said.

27.     By midday on Monday, March 17, 2008, Bear Stearns stock had collapsed another 85% to $4.30 per share on volume of 75 million shares.

28.   As a result of Defendants' false statements, Bear Stearns' stock price traded at inflated levels during the Class Period.

## ADDITIONAL SCIENTER ALLEGATIONS

29.   As alleged herein, Defendants acted with scienter in that each Defendant knew that the public statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Bear Stearns, their control over, and/or receipt and/or modification of Bear Sterns' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bear Stearns, participated in the fraudulent scheme alleged herein.

30.   Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company because: (i) it deceived the investing public regarding Bear Stearns' business, operations, management and the intrinsic value of Bear Stearns common stock; (ii) it enabled Defendants to artificially inflate the price of Bear Stearns shares; and (iii) it caused Plaintiff and other members of the Class to purchase Bear Stearns' common stock at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

31.     By misrepresenting Bear Stearns' financial condition, the Defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Bear Stearns' financial condition was not as healthy as represented, the Individual Defendants permitted Bear Stearns to falsely conceal its liquidity crisis.

32.     These omissions caused and maintained the artificial inflation in Bear Stearns' stock price throughout the Class Period.

33.     On March 13, 2008, after the market closed, news of Bear Stearns' deteriorating liquidity was revealed, causing the Company's stock to plunge 47% on March 14, 2008.

34.     Then, on March 16, 2008, the JPMorgan purchase of Bear Stearns for $2 per share (later revised due to shareholder outrage to $10.00 per share) was announced causing the stock to drop another 85% on extremely high volume.

35.     As a direct result of Defendants' admissions and the public revelations regarding the truth about Bear Stearns' profitability and its actual business prospects going forward, Bear Stearns' stock price continued to plummet. This drop removed the inflation from Bear Stearns' stock price, causing real economic loss to investors who had purchased the stock at an inflated value during the Class Period.

## COUNT I

### For Violation of §10(b) of the 1934 Act and
### Rule 10b-5 Against All Defendants

36.    Plaintiff incorporates ¶¶1-35 by reference.

37.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

38.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    employed devices, schemes and artifices to defraud;

    (b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Bear Stearns common stock during the Class Period.

    (d)    Plaintiff and the Class have suffered damages in that, in reliance on the   integrity of the market, they paid artificially inflated prices for Bear Stearns common stock.  Plaintiff and the Class would not have purchased Bear Stearns common stock at the prices they paid, or at

all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II
### For Violation of §20(a) of the 1934 Act
### Against All Individual Defendants

39.    Plaintiff incorporates ¶¶1 -38 by reference.

40.    The Individual Defendants acted as controlling persons of Bear Stearns within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, and their ownership of Bear Stearns stock, the Individual Defendants had the power and authority to cause Bear Stearns to engage in the wrongful conduct complained of herein. Bear Stearns controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## CLASS ACTION ALLEGATIONS

41.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Bear Stearns common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families, and legal representatives, heirs, successors or assigns, and any entity which Defendants have or had a controlling interest.

42.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

43.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    whether the price of Bear Stearns' common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

44.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

45.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

46.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

19

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding Plaintiff and the members of the Class damages, including interest;

C.    Awarding Plaintiff's reasonable costs and attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Date: March 24th, 2008.


FEDERMAN & SHERWOOD

William B. Federman, WF 9124
10205 North Pennsylvania Ave.
Oklahoma City, Oklahoma  73120
Telephone:  (405) 235-1560
Facisimile:  (405) 239-2112
WBF@federmanlaw.com

*Attorneys for Plaintiff Greek Orthodox Archdiocese Foundation, George Keritsis, Trustee*

Plaintiffs Certification of Investment of
The Bear Stearns Companies, Inc. [NYSE: BSC]

I, George Keritsis _____, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the Complaint in this action and authorize the filing of this Certification.

2.    If chosen, I am willing to serve as a representative party on behalf of the class (the "Class") as defined in the Complaint, including providing testimony at deposition and trial (if necessary). I am willing to participate on an executive committee of shareholders.

3.    Plaintiff's transaction in The Bear Stearns Companies, Inc. [NYSE: BSC] security that is the subject of this action is:

| # SHARES PURCHASED | DATE PURCHASED | PRICE PER SHARE | IF SOLD # OF SHARES SOLD | DATE SOLD (if applicable) | PER SHARE SOLD PRICE |
|---|---|---|---|---|---|
| 50,000 | 12 March 2008 | 64.67 | | | |
| | | | | | |
| | | | | | |
| | | | | | |

(continue on blank piece of paper, if necessary)

4.    I did not purchase these securities at the direction of my counsel, or in order to participate in a lawsuit under the Securities Exchange Act of 1934.

5.    During the three-year period preceding the date of the Certification, I have not sought to serve, nor have I served, as a representative to any party or on behalf of any class in any action arising under the Securities Exchange Act of 1934.

6.    I will not accept any payment if chosen to serve as a representative party on behalf of the Class beyond my pro rata share of an award to the Class, or as otherwise ordered and approved by the Court.

_____          _____
Signature                                                     Address

George Keritsis,
Greek Orthodox Archdiocese Foundation Vaduz
_____          _____
Name       (please print)                                 City

_____          State: _____ Zip: _____
Telephone Number

_____          _____
Cell Number                                               E-Mail Address

Signed under penalty of perjury, this  20  day of  March _____, 2008.

Return to:
William B. Federman
FEDERMAN & SHERWOOD
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
(405) 235-1560/Fax (405) 239-2112
Email: wfederman@aol.com
Website: www.federmanlaw.com